AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Virginia

F I L E
APR - 6 2018
CLERK, U.S. DIST...
A...

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
ZTE Cellular Telephone, Model Z956, IMEI: 86117003379154

)
)
)
)
)
)

Case No.  18-sw-188

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____ **Eastern** _____ District of _____ **Virginia** _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841(a)(1) and 846 | Conspiracy to distribute 28 grams or more of cocaine base, a Schedule II controlled substance |

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

SAUSA David A. Peters

_____
*Applicant's signature*

FBI Special Agent Paul Fisher
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 04/06/2018 _____

_____/s/_____
Michael S. Nachmanoff
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

The Honorable Michael S. Nachmanoff
*Printed name and title*

## ATTACHMENT A

The property to be searched is listed below (hereinafter referred to collectively as "the Devices"). The Devices are currently located in the FBI evidence locker, which is located at 9325 Discovery Boulevard, Manassas, Virginia 20109, which is within the Eastern District of Virginia. The Device is described below:

| Manufacturer | Model | IMEI Number | Serial Number |
|---|---|---|---|
| ZTE Phone | Model: Z956 | IMEI: 861170033790154 | Serial: 320275253758 |

The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute controlled substances), including:

      a.  any conversations, whether through text messages or other applications, where MORRIS discusses controlled substances;

      b.  lists of customers and related identifying information;

      c.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      e.  any information related to sources or purchases of firearms;

      f.  any photographs of controlled substances or firearms; and

      g.  all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

19

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division



FILED

APR – 6 2018

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE MATTER OF THE SEARCH OF:

ZTE Phone, Model Z956,
IMEI: 861170033790154

CURRENTLY LOCATED AT
FBI Evidence Locker, which is located at 9325
Discovery Boulevard, Manassas, Virginia,
20109

Case No. 1:18-sw-188

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Paul Justin Fisher, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device—which is currently in law enforcement possession, and the extraction from

that device of electronically stored information described in Attachment B.

2.      I am an investigative and law enforcement officer of the United States, within the

meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct

investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code,

Section 2516.

3.      I have been a Special Agent with the FBI since August, 2012.  I have received

basic law enforcement training at the FBI Academy in Quantico, Virginia.  I am currently

—

assigned to the FBI's Washington Field Office, Northern Virginia Resident Agency.  I am currently assigned to a squad that investigates narcotics, criminal enterprises, and violent gangs. Prior to this assignment, I was assigned to a squad assisting in public corruption investigations, including related white-collar and financial crimes.

4.     I have become knowledgeable about the enforcement of state and federal laws pertaining to narcotics and dangerous drugs.  Based on this experience, I have learned about the operations of narcotics trafficking organizations, the unique trafficking patterns and strategies that they employ, and the patterns of drug abuse of their members.  During the course of my participation in investigations I have testified in grand jury and trial proceedings.  Through my employment with the Federal Bureau of Investigation, I have gained knowledge about the use of various investigative techniques including the utilization of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.

5.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.     The property to be searched is listed below (hereinafter referred to collectively as "The Device").  The Device is currently located in an FBI evidence locker at 9325 Discovery Boulevard, Manassas, Virginia, which is located within the Eastern District of Virginia.  The Device is a ZTE Phone, Model Z956 with IMEI: 861170033790154.

7.      The applied-for warrant would authorize the forensic examination of The Device for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

8.      In or around July 2016, the Federal Bureau of Investigation (FBI), the Loudoun County Sheriff's Office (LCSO) and the Leesburg Police Department (LPD) became aware of JOSEPH LEE MORRIS (hereafter "MORRIS") and a co-conspirator (hereinafter referred to as CC-1)[1] while conducting a parallel investigation into the distribution of narcotics in Loudoun County, Virginia, located in the Eastern District of Virginia.  Investigators learned that MORRIS was known as a narcotics dealer in Loudoun County, Virginia.  LCSO detectives were utilized as Undercover Employees (UCE) to conduct eleven controlled purchases of cocaine and crack cocaine, totaling approximately 9.2 grams of cocaine and 20 grams of crack cocaine.  In addition, LCSO conducted a traffic stop on March 3, 2016 on a co-conspirator (hereinafter referred to as CC-2),[2] who, at the time of the stop, possessed approximately 97 grams of crack cocaine.  CC-2 admitted to having recently obtained this crack cocaine from MORRIS, and identified MORRIS as his main source of supply.

A. **Controlled Buys**

9.      After identifying MORRIS and CC-1 as narcotics distributors in Loudoun

---

[1] CC-1 pled guilty to conspiring to distribute 28 grams or more of cocaine base in the Eastern District of Virginia. CC-1 has other prior drug convictions in state court. CC-1 is cooperating in the hopes of obtaining a reduction in his sentence. CC-1 has provided information that law enforcement has been able to corroborate through independent means. I consider CC-1 to be reliable.

[2] CC-2 pled guilty to conspiring to distribute 28 grams or more of cocaine base in the Eastern District of Virginia. CC-2 is cooperating with the hopes of obtaining a reduction in his current sentence. CC-2 has provided information that law enforcement has been able to corroborate through other means. I consider CC-2 to be reliable.

County, Virginia, the UCEs conducted several controlled purchases from MORRIS through CC-

1 and LCSO Confidential Source (hereinafter referred to as CS-1).[3]  Specifically, from on or

about December 10, 2015, to on or about December 9, 2016, the UCEs conducted approximately

six controlled buys from MORRIS through CC-1 and five controlled purchases through CS-1.

All of the controlled purchases were conducted in Loudoun County, Virginia, within the Eastern

District of Virginia.  During the controlled purchases, the UCEs purchased substances containing

cocaine and crack cocaine.  The following chart lists the date, location, and drug type/amount for

each of the controlled buys:

| Controlled Buy | Date | Location | Drug Quantity/Type (approx.) |
|---|---|---|---|
| #1 | December 10, 2015 | Leesburg, Virginia | 2.13 grams of cocaine |
| #2 | February 11, 2016 | Leesburg, Virginia | 3 grams of cocaine |
| #3 | March 18, 2016 | Leesburg, Virginia | 4.39 grams of cocaine, 0.33 grams of crack cocaine |
| #4 | March 29, 2016 | Leesburg, Virginia | 1.02 grams of cocaine, 1.5 grams of crack cocaine |
| #5 | April 15, 2016 | Leesburg, Virginia | 1.84 grams of crack cocaine |
| #6 | April 26, 2016 | Leesburg, Virginia | 2.5 grams of crack cocaine |
| #7 | May 12, 2016 | Leesburg, Virginia | 2.37 grams of crack cocaine |
| #8 | June 29, 2016 | Leesburg, Virginia | 3.11 grams of crack cocaine |
| #9 | July 15, 2016 | Leesburg, Virginia | 3.14 grams of crack cocaine |
| #10 | August 17, 2016 | Leesburg, Virginia | 3.55 grams of crack cocaine |
| #11 | December 9, 2016 | Leesburg, Virginia | 2.46 grams of crack cocaine |

        10.    After his arrest in February 2017, CC-1 consented to a law enforcement search of

his cellular telephone.  That search showed that CC-1 contacted "BABYJOE," a known alias for

MORRIS, prior to five of the controlled purchases conducted through CC-1 via text message.

---

[3] CS-1 has one prior drug related conviction in Virginia. CS-1 has been cooperated with law enforcement for
approximately two years. CS-1 is cooperating to gain relief from drug related charges. While working with law
enforcement CS-1's information has been used to seize drugs and effectuate arrests. Law enforcement has been able
to corroborate CS-1's information through independent means. CS-1's information has never been shown to be
false. For all these reasons, I consider CS-1 to be reliable.

All text messages between CC-1 and MORRIS were around the approximate times of the controlled purchases.

11.     The telephone number listed in CC-1's phone for "BABYJOE" was (703) 200-9965. The subscriber for phone number (703) 200-9965 was listed as JOSEPH MORRIS, billing address 285 Golden Larch Terrace, NE, Leesburg, Virginia 20176.

12.     The following communications are from April 26, 2016:

CC-1 (1:38 p.m.): After 6 need 45

CC-1 (6:18 p.m.): U. Around 30 and 15 both boys

MORRIS (6:18 p.m.): Yep

CC-1 (6:20 p.m.): Headed to bw walking call when I get close

MORRIS (6:48 p.m.): 441

CC-1 (6:49 p.m.): Here

13.     The following communications are from May 12, 2016:

CC-1 (5:29 p.m.): U around

MORRIS (5:40 p.m.): Yep

14.     The following communications are from June 29, 2016:

MORRIS (5:17p.m.): Just a few more

CC-1 (5:18 p.m.): At chicken place

MORRIS (5:35 p.m.): You ready

CC-1 (5:35p.m.): Yes waiting on you

CC-1 (5:50p.m.): People in Marshall parking lot

15.     The following communications are from July 15, 2016:

CC-1 (1:46 p.m.): Need 500

CC-1 (1:50 p.m.): When will you be back

CC-1 (2:47 p.m.): 650

CC-1 (4:05 p.m.): Can we do that

CC-1 (4:35p.m.): Whats up, I need to know

16.    The following communications are from August 17, 2016:

CC-1 (6:27 p.m.): U around

CC-1 (6:37 p.m.): 400-200-150

MORRIS (6:57 p.m.) Almost

CC-1 (7:02 p.m.): Inside hit me when ready

MORRIS (7:17 p.m.): OK shortly

CC-1 (7:17 p.m.): What's shortly

17.    Based on my training and experience and knowledge of this investigation, I believe that MORRIS and CC-1 were coordinating narcotics transactions using their respective cellular telephones.

**B.  Surveillance of MORRIS on October 3, 2017**

18.    On October 3, 2017, law enforcement conducted surveillance of MORRIS near his residence at 285 Golden Larch Terrace NE, Leesburg, Virginia.  Law enforcement watched MORRIS arrive at the residence at approximately 4:32 p.m. in a blue Mercedes sedan, Virginia registration VTK-3918.  At approximately 6:15 p.m., law enforcement observed MORRIS re-enter the blue Mercedes and drive to the Buffalo Wild Wings (BWW) parking lot.  Law enforcement saw four individuals meet with MORRIS at the blue Mercedes between approximately 6:21 p.m. and 7:26 p.m.  One of the individuals MORRIS met with drove a silver PT Cruiser, Virginia registration VNX-5774.  LCSO stopped this vehicle.  A canine unit arrived

6

on scene and alerted to the presence of illegal narcotics. On this basis, LCSO searched the vehicle and discovered a quantity of suspected crack cocaine. The driver, and sole occupant of the vehicle, agreed to be interviewed by law enforcement.

19.     The driver identified MORRIS as the source of supply for the crack cocaine. The driver told investigators that MORRIS had supplied him in the past.[4]  The driver showed investigators a text message sent to the phone number associated with MORRIS. That text message showed that MORRIS and the driver were in contact at approximately 6:18 p.m. The driver paid MORRIS approximately $50.00 for five "crack rocks."

20.     Based on my training and experience and knowledge of this investigation, I believe the driver of the PT cruiser purchased the crack cocaine from MORRIS in the parking lot of BWW after contacting MORRIS's cellular device.  The crack cocaine was packaged in a napkin. This was consistent with the packaging of the crack cocaine provided to the UCE's during the previous controlled purchases wherein MORRIS was the source of supply.

**C.  Interview of CC-1**

21.     In February 2017, CC-1 was arrested based on a criminal complaint charging him with conspiracy to distribute 28 grams or more of cocaine base.  CC-2 pled guilty to that same charge in the Eastern District of Virginia and agreed to cooperate in the hopes of obtaining relief on his sentence.  During an interview, CC-1 admitted that he began purchasing crack cocaine from MORRIS beginning in 2014.  CC-1 would gather money from other co-conspirators and crack cocaine users and purchase the crack cocaine from MORRIS, a common practice in narcotics trafficking known as "middling."   CC-1 purchased crack cocaine from MORRIS between three and five times a week until CC-1's arrest.

---

[4] The driver will be described as masculine regardless of actual gender.

7

22.    CC-1 admitted to contacting MORRIS's cellular telephone to setup crack cocaine transactions with "BABYJOE." MORRIS would meet CC-1 in Leesburg, Virginia, normally at or near BWW, the location normally used for the controlled purchases, and MORRIS would provide CC-1 crack cocaine contained in napkins.

**D.  Interview of CC-2**

23.    In November 2016, CC-2 was arrested based on a criminal complaint charging him with conspiracy to distribute 28 grams or more of cocaine base. CC-2 pled guilty to that same charge in the Eastern District of Virginia and agreed to cooperate in the hopes of obtaining relief on his sentence. During an interview, CC-2 admitted that he began purchasing crack cocaine from MORRIS between 2002 and 2003. CC-2 would purchase crack cocaine from MORRIS and sell the crack cocaine to users. MORRIS supplied CC-2 with crack cocaine on a consignment basis known as "fronting." CC-2 purchased approximately thirty crack rocks from MORRIS for approximately one year. CC-2 later purchased approximately an ounce (approximately 28 grams) of crack cocaine from MORRIS for $800.00 to $900.00 for the next two years. CC-2 would pay MORRIS for the crack cocaine with proceeds from its sale. CC-2 was arrested in 2004 while in possession of 28 grams of crack cocaine that he obtained from MORRIS. CC-2 convicted of state charges for possession with intent to distribute cocaine base was sentenced to five years and four months in county jail.

24.    CC-2 was released from jail in 2009. He resumed his illicit relationship with MORRIS in 2013 when he began obtaining distribution quantities of crack cocaine. CC-2 purchased approximately 12-15 grams of crack cocaine for $850.00 to $900.00 from MORRIS twice a month for approximately one year. On two occasions in 2014, CC-2 purchased approximately two ounces of crack cocaine from MORRIS. On those occasions, CC-2 claimed

that MORRIS broke the large package into user quantity baggies before providing it to CC-2.
CC-2 stopped selling crack cocaine for approximately ten months beginning in July 2014.

25.     By February 2015, CC-2 resumed his illicit relationship with MORRIS and began
buying 14-15 grams for $600.00.   CC-2 progressed to purchasing 2-ounce quantities of crack
cocaine from MORRIS on four separate occasions in 2015.   In March 2016, CC-2 was arrested
while in possession of approximately 97-grams of crack cocaine.   CC-2 admitted that he
obtained this crack cocaine from MORRIS.

### E. The Arrest and Search of MORRIS' Residence

26.     On or about December 8, 2017, the Honorable Theresa Carroll Buchanan, United
States Magistrate Judge for the Eastern District of Virginia, issued a complaint and arrest warrant
charging MORRIS with conspiracy to distribute 28 grams or more of a mixture and substance
containing a detectable amount of cocaine base, a Schedule II controlled substance, in violation
of Title 21, United States Code, Sections 841(a)(1) and 846.   Judge Buchanan also issued a
search warrant for MORRIS's residence at 285 Golden Larch Terrace, NE, Leesburg, Virginia.

27.     On or about December 12, 2017, at approximately 6:15 a.m., law enforcement
attempted to arrest MORRIS at 285 Golden Larch Terrace NE, Leesburg, Virginia.   MORRIS
was not present.   Law enforcement attempted to contact him at (703) 200-9965 with negative
results.   Law enforcement later learned that MORRIS discontinued his use of that number.

28.     The same day, law enforcement searched 285 Golden Larch Terrace NE,
Leesburg, Virginia, pursuant to the search warrant.   During the search law enforcement located a
flashlight inside a toolbox in the garage near the entry way into the main residence.   Inside the
flashlight, agents located two paper towels containing approximately 11 grams of an off-white
rock like substance, similar to the substance seized during the controlled purchases with

9

MORRIS. The substance was transported to the FBI Northern Virginia Resident Agency, 9325

Discovery Boulevard, Manassas, Virginia, which is located within the Eastern District of

Virginia. A field test of the substance confirmed the presence of cocaine. Laboratory testing

confirmed the substance was approximately 11 grams of crack.

29.     Inside the master bedroom, agents located a pill bottle and plastic bag containing

approximately 84 off-white pills with an "M" logo and the number "30" imprinted on the other

side. The pill bottle displayed a prescription sticker for MORRIS, JOSEPH and the listed

medication was Oxycodone HCL 30 mg. A smaller pill case containing approximately 16 of the

same off-white pills was located by agents in the same tool box with the white-rock substance

located in the flashlight.

30.     A query of the Prescription Drug Monitoring Program database showed MORRIS

was filling his prescription at a Safeway pharmacy in Arundel Mills Mall, located at 7643

Arundel Mills Boulevard, Hanover, Maryland. On or about February 21, 2018, law enforcement

located MORRIS while he was filing a prescription at the Safeway. Just before his arrest,

MORRIS was seen speaking on a cellular device (the Device) outside of the Safeway in the

vicinity of the parking lot. Law enforcement apprehended MORRIS without incident

**F.  The Device**

31.     Law enforcement searched MORRIS incident to arrest, resulting in the discovery

several items, including The Device and $1,446.68 in cash. On or about February 28, 2018, the

Device was transferred from the Maryland State Police (who assisted in the arrest) to the FBI and

transported to the Northern Virginia Resident Agency, 9325 Discovery Boulevard, Manassas,

Virginia, which is located within the Eastern District of Virginia.

32.     The Device is currently stored in an FBI evidence locker located at 9325

Discovery Boulevard, Manassas, Virginia, which is located within the Eastern District of Virginia. In my training and experience, I know that the Device has been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the FBI.

33.    Based on my training and experience, I know that drug dealers typically utilize cellular telephones to coordinate narcotics transactions. I also know that drug dealers will often utilize multiple such phones at any time in order to avoid detection by law enforcement. Alternatively, I also know that drug dealers will often switch cellular telephones to avoid detection by law enforcement.

34.    Given my training and experience and based on my knowledge of this investigation, I believe MORRIS stopped using his cellular telephone with assigned call number (703) 200-9965 to evade arrest by law enforcement. Given my knowledge that MORRIS communicates about his drug business using text messages, I further believe there are stored communications, along with other data, on The Device related to MORRIS's ongoing drug business and efforts to avoid arrest.

## TECHNICAL TERMS

35.    Based on my training and experience, I use the following technical terms to convey the following meanings:

  a.  *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call

11

log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media.

12

Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data

13

and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f.  *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

36.   Based on my training, experience, and research, I know that the Devices have the capabilities that allow them to serve as a wireless telephone, digital camera and they can access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

37.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

38.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct

14

evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

15

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

40. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

41.      I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items described

in Attachment B.

Respectfully submitted,

Paul Fisher
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on April 6, 2018:

_____/s/_____
Michael S. Nachmanoff
United States Magistrate Judge

The Honorable Michael S. Nachmanoff
United States Magistrate Judge

17

/s/
Michael S. Nachmanoff
United States Magistrate Judge

## ATTACHMENT A

The property to be searched is listed below (hereinafter referred to collectively as "the Devices"). The Devices are currently located in the FBI evidence locker, which is located at 9325 Discovery Boulevard, Manassas, Virginia 20109, which is within the Eastern District of Virginia. The Device is described below:

| Manufacturer | Model | IMEI Number | Serial Number |
|---|---|---|---|
| ZTE Phone | Model: Z956 | IMEI: 861170033790154 | Serial: 320275253758 |

The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

18

## ATTACHMENT B

1.     All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute controlled substances), including:

      a.   any conversations, whether through text messages or other applications, where MORRIS discusses controlled substances;

      b.   lists of customers and related identifying information;

      c.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      d.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      e.   any information related to sources or purchases of firearms;

      f.   any photographs of controlled substances or firearms; and

      g.   all bank records, checks, credit card bills, account information, and other financial records.

2.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.